## BAKER *v.* WILLIAMSON.

After an issue directed whether funds were received as a gift or in trust, and a verdict finding it to have been a gift, the court, on appeal, decreed an account as of trust funds, without sending it to another jury.

The examination of a defendant trustee by the complainants, does not compel the court to receive his statements of matters of discharge as conclusive in his favour.

Therefore, where A., shortly before his death, directed a conveyance of all his property to his three nephews, to be prepared under a secret verbal trust, and the beneficiaries on a bill for an account, referred to an auditor, examined one of the grantees, who admitted that the grantor held notes of his for loans, but averred a present of them to himself on a day between the giving the instructions for the conveyance and before its execution; and also presented him with a check for $5000, which was not drawn until after the death of the grantor: the court charged the defendant, as trustee, with the amount of the notes and check, there being other evidence of the existence of notes, but the particulars unknown, and also of the check, and one witness testifying to facts inconsistent with the alleged gift; the defendant also having concealed the facts until pressed, when evasive answers were made.

Where a conveyance was made under a secret trust, for the purpose of evading the law taxing collateral inheritances, the trust will be enforced; in this case, there was no evidence of the complainant being personally concerned in the fraud, though one of the persons whose interest he claimed was present at the execution of the deed, and knew of the fraudulent intent.

APPEAL from the Common Pleas of Delaware county. In equity. *Jan.* 18, 19. Anthony Baker filed a petition, setting forth that John Williamson, by deed, dated the 9th of August, 1841, shortly before his death, conveyed certain messuages, &c., and all his other property, real and personal, to Adam B., Azariah L., and Enos Williamson in fee, in trust, with verbal directions as to the distribution of a portion thereof.

That for the purpose of settling disputes, it had been agreed between the said grantees and others, heirs of said John Williamson, that certain sums of money should be retained, and paid over to the parties to the agreement before the 1st of April, 1843; and it was further agreed, that if the personal estate of said decedent, exclusive of interest, exceeded $29,000, the excess should be distributed among the parties to the agreement in certain proportions. That the estate amounted to $38,664, and that the said grantees had in their hands $9000, distributable among the parties, &c.

That the shares of the parties, other than the trustees, were vested in the petitioner by assignment, and in right of his wife, who was one of them; and an answer and account was prayed.

The respondents by their answer admitted the agreement for distribution, but denied that so much remained for distribution as was alleged. They averred that the value of the estate amounted to $33,510 57, a schedule of which, so far as collected, and of the debts uncollected,

were set out; of this sum $5455, they alleged, had not been collected, nor were they able to obtain it; and they submitted to pay according to the agreement when the amount was received.

To this answer exceptions were filed; first, in not charging themselves with $3129, due by Adam B. to the decedent, at the date of the deed: the others are immaterial to the present case.

Upon a reference, the complainants examined Enos Williamson, one of the respondents. He stated, that shortly before the death of John, who was the uncle of the defendants, and without children, he (Enos) had obtained and carried home all the bonds and papers of the decedent; they were taken from a locked desk which Azariah opened, but he did not take a list of them at that time; that the answer contained a list of all, so far as he knew; he did not know of the existence of notes of Adam B. to decedent. The decedent's last sickness continued three or four weeks. Thomas Dunn and wife composed his family. He (Enos) was there every other night, taking turns with Azariah. Adam was there in the daytime.

Adam B., another of the trustees, was also examined by the complainant. He stated, he was not indebted to John W. after August 9th, the date of the deed, nor on that day; that he had been indebted previously, and given a note for $500; they settled that on the 7th of August. Decedent gave it to him, nobody being present, and he destroyed it; on this, interest had been paid. He had also given another note for $890; this and another for $1600, given November 17, 1840, were also delivered up on the 7th of August, 1841. He said his uncle and he had frequent conversations about the money he had; on one occasion, he and his uncle went to his room, and with great privacy made out a memorandum of the uncle's bonds, &c.; he did not wish it mentioned on account of the taxes. His uncle said he had been a long time in getting the money together, and did not wish it squandered. Some of his relations would be injured by it. He could not make a will, but wanted to put it into some one's hands to take care of it for the family, and he thought of witness; witness declined, on account of family jealousies, but decedent persisted, and Azariah was then proposed to be jointly concerned. During his last sickness, he stated to Adam (the witness) that he had thought of Azariah, Enos, and Adam, taking the estate into their hands, as he wished it taken care of. Witness promised to do so. Witness then continued, " he said there was a good deal of money, and I might have it. He drew a check, or I drew it, and he signed it for $5000, on the 6th of August." On the 7th, witness was there again, and his uncle informed him that Enos and Azariah had pro-

cured the deed to be drawn. He directed him to pay certain taxes. "He said, he did not want his money squandered; I said there were those notes of mine, if he would make a present of them to me I would take care of them, and thank him for them. He said he did not care if I would use all my endeavours to keep all the land in the Williamson family." The notes were then taken by decedent from a locked drawer in his bedroom, and delivered up in the absence of witness's brothers; witness never mentioned it to them. Afterwards, he said there had been a conversation with Azariah, in which witness said "there had been notes, but I did not owe him any thing on the 9th."

The $5000 check was deposited to witness's credit on 21st—he mentioned the present to his brothers.

In 1836, decedent had been in the habit of consulting witness, who made a purchase of an inn and transacted other business for him, but had no general power.

Again witness said, "Azariah said he knew there had been notes, that he had seen them; I said, produce the notes against me, and I will pay them. I did not tell him about the gifts, and what took place at the time."

The original check and the witness's bank-book were both lost. Among the checks drawn in witness's favour, as appeared from the accounts in bank, was one for $6000, in 1839. He said this was handed him by his uncle, saying he had too much money to be squandered in case of his death, and directing him to take care of it. It was deposited to his own credit, and subsequently checked back again, when the inn was purchased.

Witness further stated, that until the present citation, there had been no explanations about the check with his brothers.

Azariah, another respondent, examined by complainants, stated that the bonds, &c. were taken possession of by Enos, about a week before the death of John W., and ten days after the execution of the deed; no inventory was made, and the property had subsequently been generally in Adam's hands. He also stated conversations similar to those already mentioned, and also that the object of the deed was to avoid the collateral inheritance tax. He suggested to his uncle that a stranger should be employed to draw the deed. Several persons were present at the execution; among them, one of the parties claiming as *cestui que trust* under the deed; that the understanding on the part of John W. was, "I am not to suffer—I am to have what I want." There was some conversation respecting the check with Adam at a subsequent period, but it being an unpleasant matter witness did not press it.

He said to Adam he had seen the notes the previous spring, but found none among the property, and that he knew there were notes against him; the answer was, Produce any notes against me, and I will pay them.

W. W. Green, a son of a niece of John Williamson, was then called. His evidence was objected to, as he was one of the parties to the deed of compromise, and had assigned his interest to the complainant; there was evidence that this assignment was executed in expectation of these proceedings; all this, however, is immaterial here, as the court decided the cause without taking this and other evidence of the same character into consideration.

He stated conversations with his uncle relative to the design to avoid the collateral inheritance tax, similar to that mentioned by the other witness; his share was assigned to complainant, and by him released to defendants.

A witness for the respondents proved the execution of the deed, and that it was said, if John (the grantor) got well, it was to go for nothing. Other persons who were present at the execution, among them the justice who took the acknowledgment, said they did not hear this.

Upon the hearing, the court sustained the exception by Adam, as to the charge made by the auditor for the amount of the notes, and directed a feigned issue upon the check for $5000.

Upon the trial, Adam, the plaintiff therein, proved by the books of the bank, a credit to his account for the check charged to John Williamson on the 21st August, and rested.

Defendant proved the original conveyance to Adam and others; the deed of compromise; and the assignment of the interest of the parties claiming as *cestuis que trust* to himself.

He then called Thomas Dunn, who lived with John Williamson. He saw him execute the deed, by looking through a hole in the chamber door; he stated that Green, one of the parties to the deed of compromise, was present, and remained after the others had left, and inquired as to the shares various persons were to receive; among others, if Adam was to have as much as the rest: to which the uncle replied, "Yes, or he will be angry." "He then asked him about some notes he held against Adam; he said he still held them against him, that Enos and Azariah were two honest men, and they would keep Adam straight; that about the end of June, or in July, John Williamson asked where the boy was, as he wished to send him to Adam about some money; he would go this time, but no more; if he did not pay him he would sheriff him." "He said Adam owed him

money ; I told him I had heard he owed Adam money for transacting business for him ; he said it was no such thing, he did not owe him a cent."

It was proved by a number of witnesses, that Adam was in the habit of transacting business for his uncle during a number of years, receiving and lending money, paying debts, &c.

The jury found for the plaintiff, and the court decreed accordingly.

The refusal of the issue on the notes, and for not charging the respondent, Adam, with the amount of the notes and the check, were the errors assigned on this appeal.

The case was argued at the last term by *Lewis* and *Meredith*, for appellant, and *B. C. Tilghman* and *Tilghman*, for respondents; and now by *Meredith*, *B. C.* and *B. Tilghman*.

*For appellant*—it was said this was an arrangement by one in prospect of immediate dissolution, for a testamentary distribution of his property in such a manner that the payment of the collateral inheritance tax might be avoided. The course taken was a conveyance with a parol trust, resting to this time with the grantees, but not the less testamentary on that account, as it is admitted the deed was to operate only in the event of the death of the grantor. The grantees have conceded by the compromise, a right to any surplus beyond a certain sum : the questions then are, whether in taking the account, the notes due from the grantee, and the check delivered to him immediately before the execution of this trust-deed, are to be charged with the trusts there created.

Supposing the property had been bank notes, so as to pass by delivery, would not the inference be irresistible, that the delivery, after instructions were given for the deed, and the deed itself, when executed, constituted but one transaction. As to the notes, they were in this situation, the drawer being in fact an executor. It is also proved, that immediately before the alleged gift, the holder demanded payment, and threatened suit if it was not made. There is no evidence that Adam's share was to be greater than his brother's ; but this would give him an excess of $8000.

There is evidence of the previous existence of the notes, and that Adam obtained possession of the papers before an inventory was made.

The simple question is, can a trustee prove by his unsupported declaration, that property transferred to him about the time the trust was being formally created, after it had been designed, and the instruments were being drawn, was intended as a gift. Such a doc-

trine is too dangerous, and without precedent. It would apply in all cases of executors; an absurdity, which, in such case, would not be tolerated for a moment.

The evidence is plainly contradictory of this; he never pretended to have received such a gift; said nothing about it, until pressed for explanation; and then, Did he aver a gift? No, but said "if you will produce the notes I will pay them." The least that could be asked, would be that the conduct of the parties rendered it probable. The court decided not on their personal belief, but on technical rules as to the effect of an answer and examination; it was said these were erroneously applied.

The act of Assembly allows the privilege of examining a trustee. The rule is, that an answer denying accountability must be disproved; but the answer, so far as it sets up matters of discharge, must be proved as part of the defendant's case. To hold the use of the privilege allowed by the act makes the trustee the witness of the complainant, would render it worse than useless; for in such case he could not be contradicted. In fact, all answers by trustees are examinations; and this is but cross-examination. On the subject of the effect of answers, &c., were cited Gresley, Eq. Ev. 395; Awdley *v.* Awdley, 2 Vern. 194; Parterich *v.* Powlet, 2 Atk. 384; Blount *v.* Burrow, 4 Bro. Ch. Ca. 75; Ridgeway *v.* Darwin, 7 Ves. 405; Thompson *v.* Lambe, Ib. 588; Robinson *v.* Scotney, 19 Ves. 582.

As to the check, this does not imply a gift, but *primâ facie* payment of a debt; next a loan, and last of all, a gift. 7 Serg. & Rawle, 116; 4 Taunt. 293; 6 Cow. 493. [ROGERS, J., is there any presumption that it is a gift?] No; that requires proof. Look at the facts. It was drawn *after* the deed was executed; the presumption is, that it was in execution of the trust. There being no other evidence on the feigned issue, this is not rebutted.

*For the respondents*—it was said to be conceded, that the notes were delivered on the 7th. Whether the examination of the party estopped the party examining, was not the question, but the evidence was used before the auditor, and again before the court, so that the complainant, with full notice, had elected to treat the witness as his own. Such examination having been used below, cannot be objected to on appeal, Eden *v.* Bute, 1 Bro. P. C. 465. But it is settled that an examination of a party before a master, is like an answer to a bill of discovery, and must be taken for true until contradicted. Benson *v.* Le Roy, 1 Paige, 122; Gilbert *v.* Whetherell,

2 Sim. & Stu. 259; 10 Johns. 524.   In Chaffin *v.* Chaffin, 2 Dev. & Bat. 255, precisely this case, the examination is said to be evidence for the party.

This was in Chancery, the court, by the act of 16th June, having full chancery powers; this was recognised when the case was here before.   And the same rules of evidence are applicable.   Mylin's Estate, 7 Watts, 64.

The examination was not of matters touching the execution of the trust, but of those preceding its creation; it must therefore have been under the general equity powers.   The respondent does not seek to discharge himself, but shows how it was that he obtained the property, viz., not under the trust, but by a distinct gift.

It may fairly be said, if the court were to take part of an answer, and disregard the residue—charging by admissions, without regard to qualifications of the admissions, it would cease to be a court of equity.   Here the admissions are simply how, in what character, the money came to him; it is impossible to take one part of the fact, and not the other.

As to the check, the examination was not read; the only question is as to the effect of a receipt of a check previous to the creation of the trust.   If the check was no evidence, a nonsuit should have been moved for; but they preferred going into proof; and on that the jury found a gift.

The case of the respondent will be found, on examination, not to be so unreasonable as is supposed.   The uncle was aged, of large property, without children, and having numerous nephews and nieces; he desired to avoid the tax, but chiefly to preserve the land in the possession of those of his own name.   This nephew had been his confidential agent in the transaction of his business, and it was natural to prefer him.   The fear of exciting the jealousies of the other claimants accounts for all the secrecy; and when it is remembered that all the property was thus intrusted, and that they have accounted for so large a portion, it is but fair to give credence to the party admitting so much against his interest, when a part of his testimony merely excludes him from further liability.

The arguments on the admissibility of Green's evidence are omitted, the point not being decided.

*March* 13.   COULTER, J., (after stating the general features of the case.)—Before considering the facts and the law of the case, it may be observed, that the alienees in the deed of John Williamson, deceased, who are the appellees or respondents in this proceeding, do

not appear before this court in an aspect which demands particular favour from a court proceeding upon Chancery principles. John Williamson was an old man at the time the deed was executed, and had neither wife nor children. He had amassed a large fortune, and made an absolute deed of all his estate to his three nephews, in part for the purpose of depriving the Commonwealth of the collateral inheritance tax, thus depriving himself of the means of subsistence, if he had survived the malady with which he was then labouring, and allowing himself to be buried by the charity of others. If we allow the influence of the ruling passion strong in death, and the infirmities of age, mental and bodily, to palliate this course on the part of the old man, the co-operation of the grantees, who appear to have been comparatively young, and possessed of considerable property themselves, is not covered by the same excuse. Be that as it may, however, the agreement of the 25th August, 1842, above referred to, is the basis upon which this cause must be ruled between the parties; and if it is established by competent evidence that the respondents received $9000, or any less sum of the personal assets of John Williamson over and above $29,000, they hold it in trust for the complainants, and must account for it. [His honour here stated the two items of charge.]

A great part of the difficulty is owing to the nature and character of part of the testimony in the cause, that is, the evidence of Adam B. Williamson, one of the defendants, who was, with the other defendants, examined at the instance of the complainants. The counsel for the respondents contend, that the testimony of Adam ought, under the circumstances, to be considered as an answer in Chancery to a bill of discovery, and, as such, to be conclusive on the facts to which he testifies, unless disproved by the oaths of two witnesses. A number of authorities have been cited to sustain this position, but they have failed to satisfy the mind of the court. To a certain extent, the rule in Chancery is as contended for by the respondents. But it is confined to small sums, in matters of account not exceeding in the aggregate one hundred pounds; and is adopted for the purpose of saving costs and ending litigation about inconsiderable affairs. If an answer in Chancery is contradictory in itself, is contrary to the known and well-established analogies of social life, or, for the purpose of evidence, demands a departure from moral axioms of belief, it would be unreasonable to give to it the character of such high and imposing verity. Coming from an interested party, it ought to be clear and distinct; consistent with itself, and not at war with well-established facts in the cause. Slight circumstances thrown

in the scale of the oath of a disinterested witness, ought to out-
weigh it.   It would, indeed, be anomalous, if a chancellor was
bound to decree against the convictions of his conscience, and the
belief of his mind, produced by all the circumstances and facts in a
cause, by a technical rule of evidence, in relation to the value of the
testimony of any one witness.   We must, therefore, look at the facts
of the case, as admitted by the parties, or established by the testi-
mony of disinterested witnesses, in connection with the testimony
of Adam, in order to determine what degree of credit ought to be
given to it.   The fact to be established is, that on the 9th day of
August, 1841, John Williamson had and held three notes or bonds
against Adam, amounting together to the sum of $2990.   The ar-
rangement for transferring all the estate of the old man to Azariah,
Enos, and Adam, was made on the 4th of August, 1841.   Thomas
Dunn and his family lived in the house with the old man.   After he
had been unwell for some time, Enos and Azariah stayed with him at
nights alternately, and Adam stayed with him generally through the
day.   On the 6th of August, Enos and Azariah went to Chester to
get the deed drawn, during which day Adam was with him, and
also on the 7th.   Thomas Dunn testifies, that he saw the old gentle-
man sign the deed of the 9th August, 1841.   He says: "I don't
know whether Enos was in the room or not; 'Squire Sheldon and
William Hunter were there.   I did not see Walter Green in the room.
Frazer Green was there; I did not see him in the room when the
old man was about to sign the deed.   I heard him say he wished it
to be read.   One of the two, I think it was Adam, I wont be sure,
said, We read it to you yesterday; you know all that is in it.   It was
in August, the same year he died.   Frazer Green asked the old man
whether Adam was to have as much as the rest of them.   He said,
Yes, or Adam would be angry.   He asked him, what Pratt Roberts
was to have; he said, $500.   He then asked him about some notes
he held against Adam; he said he still held them against him.   He
said, Enos and Azariah were two honest men, and they would keep
him straight."   Thus, it is established by the testimony of a disin-
terested witness, that on the day of the execution of the deed, John
Williamson believed he held these notes against Adam.   Azariah
testified that he had seen the notes during the Spring before, that
was of 1841.   Dunn also testified, that in June or July, John Wil-
liamson told him, that Adam was indebted to him, and if he didn't
soon pay him he would sheriff him.   Thus are the existence of the
notes, and the belief of the deceased that he held them on the 9th
of August, 1841, established.   This would have been sufficient to

have thrown upon Adam the proof that they had been paid or cancelled in some way. Especially, considering the fiduciary character in which he had consented to stand in relation to the heirs. The only point not established was, the amount and sums of the different notes, their dates, &c. As Adam had transacted business for the deceased, and was with him the greater part of the day of the 6th and 7th of August, 1841, and had access to the desk while the feeble old man was in bed, and especially as the papers were delivered to him by Enos and Azariah, when they were taken out of the desk before the old man's death, without any inventory or examination of the bonds; it might have been a question of grave importance, whether any one of the complainants, under such circumstances, might not have been examined to prove that single fact of their amount, under that high and transcendant necessity which the law allows on some occasions, to furnish the rule and the reason for anomalous proceedings, and in *odium spoliatoris.* But for this purpose alone, as we may suppose, the complainants examined Adam himself as a witness. [His honour here stated the evidence of Adam.]

The issue is thus formed. The existence of the notes is clearly established by Dunn, corroborated by Azariah, and admitted by Adam himself; but Adam swears, that the old man made a gift of them to him on the 7th, whereas Dunn swears, that the elder Williamson thought he had them on the 9th of August. There are many circumstances which essentially enter into a just appreciation of the value of Adam's testimony. He says, he procured them as a gift from the old man, while Azariah and Enos were at Chester for the purpose of having the deed drawn. He did not mention the gift of the notes to Azariah or Enos when they returned, nor at any time during the life of the old man, which he would naturally have been impelled to do if they had been a *bonâ fide* gift. He was a man of business, and could not have been insensible to the suspicion that would naturally and obviously attach itself to the transaction if shrouded in secrecy till after the old man's death. To shield himself from this, he would, if all things were honest and fair, have disclosed the fact to his co-assignees and trustees, especially as he intended to claim a gift of the check drawn in his favour by the old man the day before for $5000. Here was the sum of $8000 secretly withdrawn from the fund, which the old man agreed on the 4th to transfer to the three nephews, for their own benefit and the benefit of his other heirs, in the presence of the three; and the old man never mentioned it at the execution of the deed, nor at any other time, nor did Adam during the old man's life: and when Azariah

inquired about these notes after their uncle's decease, Adam did not, even then, allege a gift, but said, "produce any notes against me, and I will pay them." Truth is generally frank and fearless, and seeks no indirection or equivocation; and if there had been a gift, the fact would have risen spontaneously to his lips upon this inquiry being made by his brother and co-trustee. It would appear, however, to have been his second thought which produced the allegation of a gift. His first, was to rely upon the impossibility of producing the notes. Add to these circumstances, the facts, that Adam transacted business for the old man, and therefore must have had access to the desk, for it is fairly to be inferred, that it was in the desk that the drawers were in which Adam says his uncle told him to get the gold and keep it, on the same day while the old man was lying in bed; and it was in this desk that Enos, Azariah, and Adam found the bonds and other papers, when, a week after the date of the deed, and some time before the decease of their uncle, they took them, and they were delivered to Adam without any examination or inventory having been made. He had the notes in his power after the agreement and before the deed was executed, and before the old man's death, or an inventory was taken; so that he might have secreted or destroyed them. And they never have been produced. Now, why should Adam have destroyed these notes, if a gift had been made of them? Does not the fact of their destruction, connected with his answer to Azariah, that if any notes against him were produced, he would pay them, leave room, even in a spirit of charity, for the inference, that his first impression was, to depend upon the ground, that the notes could not be *produced*, and not upon the allegation of a gift; that they were destroyed upon the analogous principle of dead men telling no tales. The existence of the notes is proved and admitted on the 7th of August, 1841. It is proved by a disinterested witness, that the old man believed he had them on the 9th of the same month. The single unsupported evidence of Adam, without even the slim circumstance of the production of the notes by him, avers that on the 7th, the notes were bestowed upon him by the old man. Adam stands in the aspect of the highest possible interest swearing money into his own pocket. The circumstances above *demonstrated*, incline the scale against him. And although the actual copies of the notes cannot be produced by the complainants, yet they produce what is equivalent, full testimony of them; and Adam ought to abide his own judgment and pay them.

It appears from the evidence, that one object of the deceased in adopting the mode of settling his estate which he pursued, was to

prevent disputes; and as he declared that Azariah and Enos were honest men who would keep Adam straight, can it be believed, then, that with these feelings strong on his mind, he would leave his bank-book, showing a large balance, being over $5000, to go into the hands of his trustees, and that he would leave no memorial of the gift of the notes to Adam, nor ever mention it? The natural course for him to have pursued, would have been to say to his nephews, Let there be no strife between you; I have bestowed upon Adam, since we agreed that I should transfer all my estate to you, his own notes for $2990, and also $5000 in the Bank of Delaware. In order that no unjust suspicions may rest upon Adam, and be the grounds of future lawsuits, I make this known. And Adam himself, to relieve his character, would have sought and requested such explanation. Is it possible that John Williamson would not have perceived, if there be foundation for the allegation of Adam, that he was himself sowing with a liberal hand the seeds of controversies and lawsuits about his estate, which he was so anxious to avoid—so anxious as to be willing to reduce himself to voluntary pauperism for the purpose in part of accomplishing that object. The whole facts of the case lead the mind to the conclusion that if Adam got these notes on the 7th of August, with the knowledge and approbation of John Williamson, he got them in the character of trustee, and that if he did not get them in that character, he got them without the knowledge or approbation of the deceased, and that in either category he ought to account for them.

It is contended, that if Adam's testimony is taken as to the amount of the notes, it ought all to be taken together, and that as he swears to the gift, that ought to be taken also. If this part of his testimony was connected with, and in the same paragraph or sentence of the admission, perhaps the one ought not to be taken without the other. But in one part of his deposition he states the amount of the notes, and in another part he swears to the gift. The rule, as established under such circumstances, is, that the one part of the deposition may be relied on without admitting the other. In Blount v. Burrow, 4 Bro. Ch. 75, Lord Chancellor Hardwicke, after stating the rule at law, says, "but what is sworn by a man's answer admits of a different construction, as if a man admit by his answer that he received several sums at different times, and in the same answer swears that he paid away those sums at different times in discharge of himself; otherwise, it would be to allow a man to swear for himself, and be his own witness." We can readily perceive the reason of the distinction taken by his lordship; for alleging a new and independent de-

fence is not directly responsive to the bill, and ought to be established by disinterested testimony; and even at law the rule is not much variant. Thus, in the case of Bermon v. Woodbridge, Lord Mansfield says: "Though the whole of an affidavit or answer must be read, if any part is, you need not believe all equally; you may believe what makes against his point who swears without believing what makes for it. Doug. 788. And the rule established in Davis v. Spurling, 1 Russ. & Mylne, 68, is to the same effect; and also in Parterich v. Powlet, 2 Atkins, 383. Adam was made a witness, it is true, by the complainants, and therefore they cannot allege that his testimony is incompetent on account of his interest. But that cannot enforce the conscience of this court, or any other court, to believe all he says, even if contrary to the laws of nature, of mathematics, of moral science, or of facts satisfactorily established in the cause by disinterested testimony, and legal inference and presumption. The same may be said in regard to another allegation of the respondents, that is, that Adam's whole testimony must be taken as true, unless contradicted by two witnesses. In early chancery practice, the rule was perhaps so held; the court adopting the rule of the Roman law, *responsio unius non omnino audiatus*, when the main fact alleged in the bill was directly denied by the answer. But this rule has been gradually yielding to the experience, judgment, and enlightened jurisprudence of later times, when the matter is resolved into the credibility, to be attached to the answer of the respondent under all the circumstances. And where his answer is precise, clear, and positive, to the main facts alleged in the bill, he is to be considered as any other witness, and when it is witness against witness, the chancellor will not decree, but dismiss the bill. Small and slight circumstances, however, will turn the scale, so small and slight, that it is impossible not to perceive that equity considers and appreciates the anomalous position of the respondent. 2 Story's Equity, § 1528; 1 Brown's Ch. Rep. 52; 9 Cranch, 160; Clark v. Van Reimsdyk, Greenl. Ev. 297; Gresley's Eq. Ev. p. 4, and the numerous cases there cited. The whole of the evidence brings us irresistibly to the belief that Adam, in good faith and conscience, ought to be charged with the notes, and we perceive nothing in the rules of law and equity which prevents our deciding the case on that conviction.

With regard to the other item of charge, to wit, the check for the sum of $5000, drawn by the old man in favour of Adam, on the Bank of Delaware, we are impelled to the same conclusion. The check was drawn on the sixth day of August, and paid by the bank on the 21st of the same month, a very few days before the old man's

death. It is dated two days after the arrangement, by which Adam was to be one of the alienees of the estate, and one of the trustees for the beneficiaries. He said nothing of it during the life of the deceased. The bank-book was left, showing the amount of the balance in bank being something over $5000. Azariah testifies as follows: " I told him I knew there was considerable money in bank. His answer was, you will not find there as much as you expect. Uncle gave me a check for $5000, a short time ago. I told him from uncle's book there was more than $5000 ; he said there is not now.. I thought it a little strange that uncle did not say any thing to me about it. It was an unpleasant thing to talk about, and I did not say much to Adam. This was after the old man's death." There was no pretence whatever, that the deceased was indebted to Adam. It never was held in any court, that a check was any evidence of a gift. The check, therefore, and drawing the money, is plenary evidence of a debt due by Adam, unless he can discharge himself by competent evidence, or evidence of so much being in his hands to be accounted for as trustee. It was never pretended in any case in Chancery, that a debt, the evidence of which was so complete, could be obliterated by the oath of the trustee. The settled rule is, on bills for an account, that the trustee can only discharge himself by his own oath of small sums under 40 shillings, provided they do not in the aggregate exceed £100. Everhard *v.* Warren, 2 Chan. Ca. 249 ; 1 Eq. Ca. Abr. 11 ; Whicherly *v.* Whicherly, 1 Vern. 470 ; Marshfield *v.* Weston, 2 Vern. 176 ; Gresley's Eq. Ev. 266. With respect to this sum, however, the court below directed an issue to be tried by a jury, and the issue was found in favour of the respondents. It was contended by his counsel here, on the argument, that the verdict ought to be, and is conclusive. In a court proceeding, according to the forms of the common law, the verdict of a jury is of high import and great solemnity; although even then one verdict is not conclusive in any case, if against the weight of evidence. The court may set it aside, and grant a new trial. But in a court of equity its effect and function is entirely different. In that court it is used merely for the purpose of informing the conscience of the court, and is incidental and auxiliary. A chancellor cannot, if he would, surrender his high prerogative and duty of deciding upon facts according to the convictions of his conscience. In that court, the wisdom of our ancestors deposited the faculty of deciding upon facts within its jurisdiction, as well as determining the rules of equity applicable to them. And where, after all, could the power be more safely lodged, especially in cases of

trusts and fiduciary transactions? · Long experience, the habit of sifting and comparing testimony, calm deliberation, and exemption from local prejudices, seem to give a guaranty for enlightened judgment. A chancellor will examine the notes of evidence by the judge who tried the cause, listen to the explanation of counsel, and, at last, if his conscience is not satisfied, will decide the cause according to his own convictions, and disregard the verdict of the jury. 6 Maddox, 58 and 113; Gresley's Eq. Ev. 405. The act of Assembly of the 16th June, 1836, gives the control, removal, and discharge of trustees, and the settlement of their accounts to the Courts of Common Pleas; and the act confers on them for that purpose the powers and jurisdiction of a Court of Chancery. We are to be guided, therefore, by the rules and principles of Chancery proceedings. It is unnecessary, then, to consider the effect of the verdict of a jury, directed by statutes, on issues sent to the Common Pleas by the Register's Court, or Orphans' Court. The cause comes into this court by appeal, as directed by statute, from the decree of the Court of Common Pleas. This court is satisfied, from the evidence, that Adam Williamson, one of the trustees or respondents, ought to be charged with the sum of $2990, with interest from the 9th August, 1841, and with the further sum of $5000, with interest from the 21st August, 1841. The decree of the Court of Common Pleas is therefore reversed, and the cause remanded to the Court of Common Pleas of Delaware county, with instructions to reform the account of Adam B. Williamson, one of the trustees accordingly. The decree of this court has been made without taking into consideration the affidavits of W. F. Green and Walter Green, before the auditors; there existed no necessity, therefore, to determine their competency and admissibility as witnesses under the circumstances, and the question was not determined.